## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

|  |  |
|---|---|
| UNITED STATES OF AMERICA,<br><br>                    *Plaintiff*,<br>v.<br><br>MICAH EUGENE AVERY, JR.,<br><br>                    *Defendant*. | Case No. 1:20-cr-00109-ABJ-1 |

## BRIEF OF AMICUS CURIAE NAACP LEGAL DEFENSE & EDUCATIONAL FUND, INC. IN SUPPORT OF DEFENDANT'S MOTION TO STAY PROCEEDINGS

JANAI S. NELSON**
     *Director-Counsel*
SAMUEL SPITAL
NAACP LEGAL DEFENSE &
EDUCATIONAL FUND, INC.
40 Rector Street, 5th Floor
New York, NY 10006
Tel.: (212) 965-2200
Fax: (212) 226-7592

CHRISTOPHER E. KEMMITT**
CHARLES MCLAURIN
MOLLY M. CAIN*
NAACP LEGAL DEFENSE &
EDUCATIONAL FUND, INC.
700 14th Street NW, Suite 600
Washington, DC 20005
Tel.: (202) 682-1300
Fax: (202) 682-1312
cmclaurin@naacpldf.org

*Pro hac vice admission pending*
**Pro hac vice motion forthcoming*

*Counsel for Amicus Curiae*

## CORPORATE DISCLOSURE STATEMENT

Pursuant to LCvR 26.1, I, the undersigned, counsel of record for *Amicus Curiae* NAACP

Legal Defense & Educational Fund, Inc. ("LDF"), certify that to the best of my knowledge and

belief, LDF has no parent companies, subsidiaries, affiliates, or companies which own at least 10%

of its stock which have any outstanding securities in the hands of the public.

Respectfully submitted,

*/s/ Charles McLaurin*

Charles McLaurin (D.C. Bar No. 1000107)
NAACP LEGAL DEFENSE &
EDUCATIONAL FUND, INC.
700 14th Street N.W., Suite 600
Washington, DC 20005
Tel.: (202) 682-1300
Fax: (202) 682-1312
cmclaurin@naacpldf.org

*Attorney of Record for* Amicus Curiae *LDF*

# TABLE OF CONTENTS

CORPORATE DISCLOSURE STATEMENT ................................................................. i

TABLE OF CONTENTS.......................................................................................... ii

TABLE OF AUTHORITIES .................................................................................... iii

INTEREST OF *AMICUS CURIAE*........................................................................... 1

INTRODUCTION AND SUMMARY OF THE ARGUMENT ................................... 1

ARGUMENT........................................................................................................... 2

   I.   The Sixth Amendment's Fair Cross-Section Requirement is Necessary for an Impartial Jury and Protects Important Societal and Governmental Interests. ............................................. 2

   II.   Systematically Excluding Black Residents in the District of Columbia from the Qualified Jury Pool Detrimentally Impacts the Effectiveness and Legitimacy of the Jury System and Harms Criminal Defendants and Potential Jurors. .................................................................. 4

      A.   Ensuring that the Qualified Jury Pool Is Comprised of a Fair Cross-Section of the Community Is Critical Because Diverse Juries Perform Their Duties Better Than Nondiverse Juries. .................................................................................................. 4

      B.   Nondiverse Juries Hurt Criminal Defendants, Particularly Black Defendants. ............... 6

      C.   The Failure to Empanel Diverse Juries Undermines the Public's Confidence in the Legal System. ....................................................................................................... 8

      D.   The Systematic Exclusion of Black Residents from the Qualified Jury Pool Inflicts Grave Injuries on the Excluded Potential Jurors. .................................................. 10

   III.   This Court's Jury Selection Plan Substantially Fails to Comply with the JSSA and Violates Mr. Avery's Sixth Amendment Right to Be Tried by a Jury Comprised of a Fair Cross-Section of His Community. ...................................................................................... 10

   IV.   This Court Could Easily Stop the Systematic Exclusion of Black Residents in the Qualified Jury Pools........................................................................................................ 14

      A.   This Court Should Use Additional Source Lists to Ensure Better Diversity in the Qualified Jury Pools. ............................................................................................ 15

      B.   This Court Should Periodically Update Address Information of Potential Jurors......... 18

      C.   This Court Should, and Could Easily, Modify Its Juror Summoning Process to Increase the Fair Cross-Section of Its Jury Pools. ............................................................... 20

CONCLUSION..................................................................................................... 22

CERTIFICATE OF COMPLIANCE ...................................................................... 23

CERTIFICATE OF SERVICE ............................................................................... 24

# TABLE OF AUTHORITIES

**Cases**

*Alexander v. Louisiana*,
    405 U.S. 625 (1972) ................................................................................................ 1

*Amadeo v. Zant*,
    486 U.S. 214 (1988) ................................................................................................ 1

*Ballard v. United States*,
    329 U.S. 187 (1946) ................................................................................................ 3

*Ballew v. Georgia*,
    435 U.S. 223 (1978) ................................................................................................ 8

*Berghuis v. Smith*,
    559 U.S. 314 (2010) ................................................................................................ 1

*Duren v. Missouri*,
    439 U.S. 357 (1979) ...................................................................................... *passim*

*Flowers v. Mississippi*,
    139 S. Ct. 2228 (2019) .......................................................................................... 10

*Georgia v. McCollum*,
    505 U.S. 42 (1992) .................................................................................................. 9

*Ham v. South Carolina*,
    409 U.S. 524 (1973) ................................................................................................ 1

*Hobby v. United States*,
    468 U.S. 339 (1984) ................................................................................................ 1

*Howell v. Superintendent Rockview SCI*,
    939 F.3d 260 (3d Cir. 2019) .................................................................................. 11

*Lockhart v. McCree*,
    476 U.S. 162 (1986) ................................................................................................ 3

*Peters v. Kiff*,
    407 U.S. 493 (1972). ............................................................................................... 5

*Smith v. Texas*,
　311 U.S. 128 (1940). ................................................................. 3

*Swain v. Alabama*,
　380 U.S. 202 (1965) ................................................................. 1

*Taylor v. Louisiana*,
　419 U.S. 522 (1975) ........................................................... 2, 3, 8

*Thiel v. S. Pac. Co.*,
　328 U.S. 217 (1946) ................................................................. 3

*United States v. Bryant*,
　523 F.3d 349 (D.C. Cir. 2008) .................................................. 3

*United States v. McClam*,
　No. 2019 CF1 9634 (D.C. Super. Ct. Aug. 18, 2022) ..................... 17

*United States v. Rogers*,
　73 F.3d 774 (8th Cir. 1996) ..................................................... 12

*United States v. Shinault*,
　147 F.3d 1266 (10th Cir. 1998) ................................................ 11

*United States v. Smith*,
　No. 19-CR-324, 2022 WL 425059, (D.D.C. Feb. 11, 2022) ............... *passim*

*United States v. Weaver*,
　267 F.3d 231 (3d Cir. 2001) ..................................................... 12

**Statutes**

Jury Selection and Service Act, 28 U.S.C. § 1861 ............................... 2, 3

Jury Selection and Service Act, 28 U.S.C. § 1863(b)(2) ........................ 15

**Other Authorities**

ACLU of D.C., Racial Disparities in Stops by the Metropolitan Police Department: 2020 Data
　Update 2 (2021),
　https://www.acludc.org/sites/default/files/field_documents/2021_03_10_near_act_update_vf.p
　df.................................................................................. 9

Am. Bar Ass'n, Am. Jury Project, *Principles for Juries & Jury Trials* (2005) ............ 18

Douglas L. Colbert, *Challenging the Challenge: Thirteenth Amendment as a Prohibition Against Racial Use of Peremptory Challenges*, 76 Cornell L. Rev. 1 (1991).......................................... 7

Equal Just. Initiative, *Race and the Jury: Illegal Discrimination in Jury Selection* 4 (2021).......... ................................................................................................................................ 4, 8, 13

Hon. Juan R. Sanchez, *A Plan of Our Own: The Eastern District of Pennsylvania's Initiative to Increase Jury Diversity*, 91 Temp. L. Rev. Online 1 (2019)............................................... 19, 21

*Important Information and Facts About TANF Requirements*, D.C. Dep't of Hum. Servs. https://dhs.dc.gov/sites/default/files/dc/sites/dhs/service_content/attachments/TANF%20Requi rements%20Fact%20Sheet_1.pdf;https://dhs.dc.gov/sites/default/files/dc/sites/dhs/service_con tent/attachments/Cash%20Assistance%20Renewal%20Fact%20Sheet.pdf (last visited Nov. 21, 2022).......................................................................................................................................... 16

J.L. Bernard, *Interaction Between the Race of the Defendant and That of Jurors in Determining Verdicts*, 5 L. & Psych. Rev. 103 (1979) ................................................................................. 7

Jacinta M. Gau, *A Jury of Whose Peers? The Impact of Selection Procedures and Racial Composition and the Prevalence of Majority-White Juries*, 39 J. Crime & Justice 75 (2016) ................................................................................................................................... 4, 6

Jeffrey Abramson, *Jury Selection in the Weeds*, 52 U. Mich. J. L. Reform 1 (2018) ........... 19, 20

Jury Plan for the Superior Court of the District of Columbia (May 28, 2020), https://www.dccourts.gov/sites/default/files/Jury-Plan-2019-Effective-Feb-2020.pdf ............ 16

Letter from 87 Former Prosecutors, U.S. Dep't of Just., to Merrick Garland, Att'y Gen., and Channing D. Phillips, Acting U.S. Att'y for the Dist. of Columbia, https://drive.google.com/file/d/10JN4kiw31V0dz9pDf6ZVfUM9XMcmsPm5/view............... 9

Liana Peter-Hagene, *Jurors' Cognitive Depletion and Performance During Jury Deliberation as a Function of Jury Diversity and Defendant Race*, 43 L. & Hum. Behav. 232 (2019). ............. 6

Linda A. Foley & Minor H. Chamblin, *The Effect of Race and Personality on Mock Jurors' Decisions*, 112 J. Psych. 47 (1982) ......................................................................................... 7

Lisa A. Sturtevant, *Washington D.C. Region Is One of the More Transient Areas in the Country*, Wash. Post: Where We Live (Dec. 18, 2012), https://www.washingtonpost.com/blogs/where-welive/post/washington-dc-region-is-one-of-the-more-transient-areas-in-thecountry/2012/12/17/1ca26680-4883-11e2-820e-17eefac2f939_blog.html.......................... 18

Nat'l Ctr. for State Cts., *Jury Managers' Toolbox: Best Practices for Duplicate Removal* (2009), https://www.ncsc-jurystudies.org/__data/assets/pdf_file/0021/7851/duplicate-removal-techniques-report-mjl.pdf .................................................................................................... 17

Nat'l Ctr. For State Cts., *Jury Managers' Toolbox: Best Practices to Decrease Undeliverable Rates* (2009), https://www.ncsc-jurystudies.org/__data/assets/pdf_file/0020/6806/undeliverable-best-practices.pdf ............... 19

Nat'l Ctr. for State Cts., *Jury Managers' Toolbox: Characteristics of an Effective Master Jury List* (2009), https://www.jurytoolbox.org/more/Characteristics%20of%20Effective%20MJL.pdf ............. 13

*New Interactive Data Tool Shows Characteristics of Those Who Receive Assistance from Government Programs*, U.S. Census Bureau (May 24, 2022), https://www.census.gov/library/stories/2022/05/who-is-receiving-social-safety-net-benefits.html .................................................................................................................. 16

Paula Hannaford-Agor, *Jury News: Neither Snow, Nor Rain, Not Heat, Nor Gloom of Night Stays These Couriers From the Swift Completion of Their Appointed Rounds*, 25 Ct. Manager 65 (2010) ...................................................................................................................... 19

Paula Hannaford-Agor, Nat'l Ctr. for State Cts., *An Overview of Contemporary Jury System Management* (2011) .................................................................................................... 20

Paula Hannaford-Agor, *Systematic Negligence in Jury Operations: Why the Definition of Systematic Exclusion in Fair Cross Section Claims Must Be Expanded*, 59 Drake L. Rev. 761 (2011) ........................................................................................................................ 11, 18

*Plan for Random Selection of Jurors*, U.S. Dist. Ct. for the Dist. of Mass (Nov. 1, 2015), http://www.mad.uscourts.gov/resources/pdf/RevisedJuryPlan.pdf .......................................... 19

*Racial Disparities in D.C. Policing: Descriptive Evidence from 2013-2017*, ACLU of D.C. (July 31, 2019), https://www.acludc.org/en/publications/racial-disparities-dc-policing-descriptive-evidence-2013-2017 ...................................................................................................... 9

Ronald F. Wright et al., *The Jury Sunshine Project: Jury Selection Data as a Political Issue*, 2018 Univ. Ill. L. Rev. 1407 (2018) ......................................................................................... 8

Samuel R. Sommers, *On Racial Diversity and Group Decision Making: Identifying Multiple Effects of Racial Composition on Jury Deliberations*, 90 J. Personality & Soc. Psych. 597 (2006) ...................................................................................................................... *passim*

Samuel R. Sommers, *Race and the Decision Making of Juries*, 12 Legal & Criminological Psych. 171 (2007) ............................................................................................................................ 7

Sandra F. Sperino, *Rethinking Discrimination Law*, 110 Mich. L. Rev. 69 (2011) ..................... 21

Shamena Anwar et al., *Unequal Jury Representation and Its Consequences* (Feb. 16, 2021), https://sites.duke.edu/patrickbayer/files/2021/03/Jury-Representation_10_aer_insights.pdf. .... 8

Spencer S. Hsu, *U.S. Judge Upholds Legality of Charging D.C. Gun Cases in Federal Court*, Wash. Post, (May 2, 2022). ........................................................................................................ 9

*Table B22003 | Receipt of Food Stamps/SNAP in the Past 12 Months by Poverty Status in the Past 12 Months for Households*, U.S. Census Bureau: Am. Cmty. Survey, https://data.census.gov/cedsci/table?q=B22&g=0400000US11&tid=ACSDT1Y2021.B22003 (last visited Nov. 21, 2022) ........................................................................................................ 15

*Table B22005B | Receipt of Food Stamps/SNAP in the Past 12 Months by Race of Householder (Black or African American Alone)*, U.S. Census Bureau: Am. Cmty. Survey, https://data.census.gov/table?q=B22&g=0400000US11&tid=ACSDT1Y2021.B22005B (last visited Nov. 21, 2022) ............................................................................................................ 15

William J. Bowers et al., *Death Sentencing in Black and White: An Empirical Analysis of Jurors' Race and Jury Racial Composition*, 3 Univ. Pa. J. Const. L. 171 (2001) ................................... 7

## INTEREST OF *AMICUS CURIAE*[1]

The NAACP Legal Defense and Educational Fund, Inc. ("LDF") is the nation's first and foremost civil rights legal organization. Founded in 1940 under the leadership of Thurgood Marshall, LDF focuses on advancing civil rights for all people in education, economic justice, political participation, and criminal justice. LDF has long been concerned about the influence of race on the administration of the criminal legal system, and that concern extends to the rights of criminal defendants to be tried before a jury derived from a fair cross-section of their community. LDF has therefore represented defendants and/or served as *amicus curiae* in numerous jury underrepresentation and jury selection cases before the United States Supreme Court including, *inter alia*, *Berghuis v. Smith*, 559 U.S. 314 (2010), *Amadeo v. Zant*, 486 U.S. 214 (1988); *Hobby v. United States*, 468 U.S. 339 (1984); *Ham v. South Carolina*, 409 U.S. 524 (1973); *Alexander v. Louisiana*, 405 U.S. 625 (1972); and *Swain v. Alabama*, 380 U.S. 202 (1965).

## INTRODUCTION AND SUMMARY OF THE ARGUMENT

Under this Court's Jury Selection Plan, nearly a third of Black people expected from the jury-eligible population residing in Washington, D.C. are excluded from the qualified jury wheel. S*ee* Decl. of Jeffrey Martin, ECF No. 115-5 (hereinafter "Martin Decl.") ¶ 45. The sources for the master jury wheel undercount Black residents, and the Court's summons procedures make the underrepresentation worse. This underrepresentation of Black prospective jurors in qualified jury pools violates Mr. Avery's Sixth Amendment right to be tried by a jury comprised of a fair cross-section of his community, harms the quality of this Court's juries, and jeopardizes its legitimacy.

---

[1] Counsel for Micah Avery consented to the filing of this brief. Counsel for the government does not object. *Amicus Curiae* states that no party's counsel authored this brief either in whole or in part, and further, that no party or party's counsel, or person or entity other than *Amicus Curiae*, *Amicus Curiae's* members, and their counsel contributed money intended to fund preparing or submitting this brief.

Nondiverse juries make more mistakes, deliberate less, and convict Black people more. Having representative juries is critical in the District of Columbia where Black people are disproportionately policed and accused.

A variety of possible remedies exist. Other courts have adjusted their jury selection plans to increase the likelihood that their juries will represent a fair cross-section of their communities by adding source lists that include more of the community, updating addresses for potential jurors, and adjusting summons procedures. This Court should follow their lead to ensure that Black defendants in the District of Columbia are no longer tried before disproportionately white juries.

The Sixth Amendment provides criminal defendants the right to an impartial jury, one derived from a fair cross-section of their community. This Court's Jury Selection Plan violates that right. Mr. Avery has made out a prima facie case under *Duren v. Missouri*, 439 U.S. 357 (1979), establishing that if his trial were to proceed with the current jury composition, his Sixth Amendment rights would be violated. Mr. Avery's proceedings should be stayed until he is able to be tried by a jury comprised of a fair cross-section of his community.

## ARGUMENT

I.  **The Sixth Amendment's Fair Cross-Section Requirement is Necessary for an Impartial Jury and Protects Important Societal and Governmental Interests.**

The Sixth Amendment guarantees that, "[i]n all criminal prosecutions, the accused shall enjoy the right to . . . an impartial jury of the State and district wherein the crime shall have been committed . . . ." U.S. Const. amend. VI. The Supreme Court has said "an impartial jury" requires that the jury be representative of the community—that it "must be drawn from a fair cross section of the community . . . ." *Taylor v. Louisiana*, 419 U.S. 522, 536–37 (1975). Thus, the requirement of "an impartial jury" "drawn from a fair cross-section of the community" is a core constitutional value. The Jury Selection and Service Act (JSSA), 28 U.S.C. § 1861, "codifies this right," stating

that federal litigants "have 'the right to grand and petit juries selected at random from a fair cross section of the community in the district or division wherein the court convenes.'" *United States v. Bryant*, 523 F.3d 349, 362 (D.C. Cir. 2008) (quoting 28 U.S.C. § 1861)).

It is crucial to the goals of the jury system that the pool of potential jurors reflects the community's demographics. "The American tradition of trial by jury . . . necessarily contemplates an impartial jury drawn from a cross-section of the community." *Thiel v. S. Pac. Co.*, 328 U.S. 217, 220 (1946). Thus, "those eligible for jury service are to be found in every stratum of society." *Ballard v. United States*, 329 U.S. 187, 193 (1946). Unrepresentative juries undermine these ideals. The exclusion of groups "clearly contravene[s] . . . the purposes of the fair-cross-section requirement," *Lockhart v. McCree,* 476 U.S. 162, 175 (1986), and systematic exclusion from jury service of distinctive groups is "at war with our basic concepts of a democratic society and a representative government." *Smith v. Texas*, 311 U.S. 128, 130 (1940).

Courts must ensure that juries are derived from a fair cross-section of the community in order to safeguard the goals of the Sixth Amendment. The Supreme Court has made clear that "the selection of a petit jury from a representative cross section of the community is an essential component of the Sixth Amendment right to a jury trial." *Taylor*, 419 U.S. at 528. Representative juries "guard against the exercise of arbitrary power [by] mak[ing] available the commonsense judgment of the community as a hedge against . . . bias," *id.* at 530, "preserving 'public confidence in the fairness of the criminal justice system,' and implementing our belief that 'sharing in the administration of justice is a phase of civic responsibility.'" *Lockhart v. McCree*, 476 U.S. at 174–75 (quoting *Taylor*, 419 U.S. at 530–31). The "prophylactic vehicle" of the representative jury "is not provided if the jury pool is made up of only special segments of the populace or if large, distinctive groups are excluded from the pool." *Taylor*, 419 U.S. at 530. But without enforcement

by courts, the Sixth Amendment right to a jury derived from a fair cross-section of the community can easily become an empty promise.

**II.    Systematically Excluding Black Residents in the District of Columbia from the Qualified Jury Pool Detrimentally Impacts the Effectiveness and Legitimacy of the Jury System and Harms Criminal Defendants and Potential Jurors.**

This Court's Jury Selection Plan has led to a significant underrepresentation of Black people; nearly a third of the Black residents in the District of Columbia are "missing" from the qualified jury wheel. S*ee* Martin Decl. ¶ 45; *see also* Jury Selection Plan for the Random Selection of Grand and Petit Jurors (hereinafter "Jury Selection Plan"), ECF No. 115-2. Systematically excluding Black residents in the District of Columbia not only violates Mr. Avery's Sixth Amendment rights, but also detrimentally impacts the quality of jury deliberations, performance, and outcomes. It also undermines the public's confidence in the legal system and harms both defendants and excluded potential jurors. Equal Just. Initiative, *Race and the Jury: Illegal Discrimination in Jury Selection* 4 (2021) (citations omitted).

**A.    Ensuring that the Qualified Jury Pool Is Comprised of a Fair Cross-Section of the Community Is Critical Because Diverse Juries Perform Their Duties Better Than Nondiverse Juries.**

Diverse juries are more likely to offer varying perspectives and to perform better: they deliberate more thoroughly, discuss facts more accurately, and are more likely to address the effects of race in criminal cases. Social science studies show that racially diverse juries are more "thorough and competent than homogenous" juries. Samuel R. Sommers, *On Racial Diversity and Group Decision Making: Identifying Multiple Effects of Racial Composition on Jury Deliberations*, 90 J. Personality & Soc. Psych. 597, 608 (2006); *see also* Jacinta M. Gau, *A Jury of Whose Peers? The Impact of Selection Procedures and Racial Composition and the Prevalence of Majority-White Juries*, 39 J. Crime & Justice 75, 78 (2016) ("[R]acially heterogeneous juries

4

perform better than all-white ones and ones containing token minority representation.") For instance, in Professor Sommers' study involving mock juries, juries with two Black jurors "outperformed" all-white juries "[b]y every deliberation measure examined." *Id.* The Sommers study showed that diverse juries "deliberated longer and considered a wider range of information than did" all-white juries. *Id.* at 606. In the Sommers study, diverse juries made fewer mistakes and were more likely to correct any inaccuracies than all-white juries. *Id.* at 608–09. By contrast, the all-white juries "spent less time on their decisions, made more errors, and considered fewer perspectives." *Id.* at 609.

The all-white juries were also more likely to shy away from discussing racism: "When the issue of racism was raised in all-White groups, at least 1 participant always reacted by suggesting it was not an appropriate topic for discussion." *Id.* at 607. White jurors serving with Black jurors, in contrast, are more willing to have substantive conversations about racism. *Id.* at 608. Especially given the frequency with which criminal trials implicate issues of race and racism, Black jurors can examine factual scenarios through a different lens that can provide a much-needed alternative perspective for any deliberating jury. Excluding Black jurors "deprives the jury of a perspective on human events that may have unsuspected importance in any case that may be presented." *Peters v. Kiff*, 407 U.S. 493, 503–05 (1972).

Black jurors are not only critical components of the jury pool because of the specific insights they offer; their presence and participation also improve the performance of other jurors. The Sommers study shows that white jurors serving with Black jurors evaluate trial information better than white jurors on all-white juries. White jurors on diverse juries are more accurate with facts and contribute more information to deliberations than white jurors on all-white juries. Sommers, *On Racial Diversity, supra,* at 606. This indicates that white jurors process "trial

information more systematically" and have "more complex thought processes" when they know they will be in a diverse setting during deliberations. *Id.* at 607. Jury diversity leads "to broader information exchange," *id.* at 606, not only because Black jurors brought unique points of view, but also because white jurors are more likely to engage in discussions about issues like race impacting the case. *Id.* at 606–07. The presence of Black jurors also motivates white jurors to avoid racial prejudice and to have a stronger sense of accountability. *Id.* "Thus, racial diversity in juries not only ensures representation of minority voices, but it also motivates all jurors to perform their duty diligently and thoughtfully regardless of [the] defendant['s] race." Liana Peter-Hagene, *Jurors' Cognitive Depletion and Performance During Jury Deliberation as a Function of Jury Diversity and Defendant Race*, 43 L. & Hum. Behav. 232, 243 (2019).

The positive impacts of diversity on jury quality are more likely to occur when the jury has more than one Black juror. *See* Gau, *supra*, at 78 ("[I]t is only when a numerical minority achieves sizeable representation that the benefits of diversity are realized."). Research has shown that "when minorities constitute a very small fraction of the whole, their impact on group processes and outcomes is limited." *Id.* at 78. When there are very few Black people on the jury, the Black jurors "may withdraw or feel pressured into conforming to the majority's viewpoint." *Id.* In other words, having one Black juror on the jury is not sufficient representation to have Black voices heard in this Court, nor for this Court's juries to experience the full benefits of having diverse juries.

**B. Nondiverse Juries Hurt Criminal Defendants, Particularly Black Defendants.**

The differences in jury quality between representative and nondiverse juries have a tremendous impact on criminal defendants, particularly when the accused is Black.

Unrepresentative juries are more likely to produce both wrongful convictions and unfair sentences that disproportionately burden Black people.

Jury experiments have led researchers to conclude that white jurors are more likely to judge Black defendants as guilty. *See, e.g.*, Linda A. Foley & Minor H. Chamblin, *The Effect of Race and Personality on Mock Jurors' Decisions*, 112 J. Psych. 47, 49 (1982) (finding white mock jurors more likely to find a black defendant than a white defendant guilty); *see also* Douglas L. Colbert, *Challenging the Challenge: Thirteenth Amendment as a Prohibition Against Racial Use of Peremptory Challenges*, 76 Cornell L. Rev. 1, 111 (1991) (White jurors "consistently returned more guilty verdicts against black defendants than they did when white defendants were charged with identical crimes."). The amount of underrepresentation of Black people in a jury impacts the likelihood of Black defendants being convicted. A study of 340 capital cases revealed that "the greater the proportion of Whites to Blacks on a jury, the more likely a Black defendant was to be sentenced to death (especially when the victim was White)." Samuel R. Sommers, *Race and the Decision Making of Juries*, 12 Legal & Criminological Psych. 171, 179 (2007) (citing William J. Bowers et al., *Death Sentencing in Black and White: An Empirical Analysis of Jurors' Race and Jury Racial Composition*, 3 Univ. Pa. J. Const. L. 171, 193–96 (2001)). In contrast, studies have demonstrated that diverse juries tend to render verdicts influenced less by racial bias. *See* Colbert, *supra*, at 112 (citing J.L. Bernard, *Interaction Between the Race of the Defendant and That of Jurors in Determining Verdicts*, 5 L. & Psych. Rev. 103 (1979)).

Lack of jury diversity also increases sentences for Black defendants. In a study about juries in Texas, researchers found that the underrepresentation of jurors from Black, Hispanic, and low-income neighborhoods in Harris County, Texas jury pools on juries increased the average sentence duration for Black defendants by over 50 percent and tripled the likelihood that Black defendants

received life sentences. Shamena Anwar et al., *Unequal Jury Representation and Its Consequences*
(Feb. 16, 2021), https://sites.duke.edu/patrickbayer/files/2021/03/Jury-Representation_10_aer_insights.pdf.

Thus, the fair cross-section requirement supports impartial jury verdicts by counteracting racial biases. The Supreme Court has explained, "[t]he broad representative character of the jury should be maintained, partly as assurance of a diffused impartiality . . . ." *Taylor*, 419 U.S. at 530. "In particular, the counterbalancing of various biases is critical to the accurate application of the common sense of the community to the facts of any given case." *Ballew v. Georgia*, 435 U.S. 223, 233–34 (1978). It is crucial for defendants' rights to an impartial verdict that they face juries that are drawn from a fair cross-section of their communities.

### C. The Failure to Empanel Diverse Juries Undermines the Public's Confidence in the Legal System.

Unrepresentative juries also undermine public confidence in the legal system. Juries need to be comprised of a fair-cross section of the community because the diversity increases public confidence in the legitimacy and fairness of the criminal legal system. *Taylor*, 419 U.S. at 530. When significant portions of the community are excluded from the opportunity to be a juror, as is the case in this Court, public confidence in the results of criminal trials wanes. "A homogenous jury, on the surface, does not look like a fair jury." Ronald F. Wright et al., *The Jury Sunshine Project: Jury Selection Data as a Political Issue*, 2018 Univ. Ill. L. Rev. 1407, 1434 (2018). This Court's current Jury Selection Plan and unrepresentative qualified jury pools threaten the legitimacy of the Court as the "credibility, reliability, and integrity of the legal system are compromised when there is even an appearance of bias or discrimination." Equal Just. Initiative, *supra*, at 5. By allowing Black residents to be significantly underrepresented in the qualified jury pools year after year, this Court is permitting "the very foundation of our system—our citizens'

confidence in it," to be eroded. *Georgia v. McCollum*, 505 U.S. 42, 49–50 (1992) (citation omitted).

      The fair representation of Black residents on this Court's jury panels is particularly crucial in the context of the District's criminal legal system where Black people are disproportionately the ones facing unrepresentative juries. Black people are over-policed compared to other racial groups that live in the District. From 2013 to 2017, Black people were arrested at ten times the rate of white people. *Racial Disparities in D.C. Policing: Descriptive Evidence from 2013-2017*, ACLU of D.C. (July 31, 2019), https://www.acludc.org/en/publications/racial-disparities-dc-policing-descriptive-evidence-2013-2017. In 2020, Black residents in the District comprised of roughly 46 percent of the D.C. population but were 74.6 percent of the people stopped by the Metropolitan Police Department. ACLU of D.C., Racial Disparities in Stops by the Metropolitan Police Department: 2020 Data Update 2 (2021), https://www.acludc.org/sites/default/files/field_documents/2021_03_10_near_act_update_vf.pdf. 86.5 percent of the stops and 90.7 percent of the searches of Black people resulted in no warning, ticket, or arrests. *Id.* Black people were disproportionately likely to be stopped in almost every D.C. police district. *Id.* at 4. Also, prosecutors in the District have recently admitted to targeting predominantly Black wards in programs that were supposed to be citywide, like the felon-in-possession initiative. Spencer S. Hsu, *U.S. Judge Upholds Legality of Charging D.C. Gun Cases in Federal Court*, Wash. Post, (May 2, 2022). Eighty-seven former federal prosecutors expressed concern over the felon-in-possession initiative, where local prosecutors elected to charge certain gun crimes in this Court (and not the D.C. Superior Court) seeking a tactical advantage, as it "disproportionately exposes the District's Black residents to increased sentences without evidence that it will improve public safety." Letter from 87 Former Prosecutors, U.S. Dep't of Just., to

Merrick Garland, Att'y Gen., and Channing D. Phillips, Acting U.S. Att'y for the Dist. of Columbia, https://drive.google.com/file/d/10JN4kiw31V0dz9pDf6ZVfUM9XMcmsPm5/view.

The criminal legal system's disproportionate impact on Black residents in the District further underscores the need for this Court to uphold defendants' fair cross-section rights. Black people disproportionately face juries in this Court and are disproportionately excluded from this Court's juries. That combination subjects Black people accused of crimes to juries that are more racially biased, more likely to convict them, less accurate, and less likely to acknowledge the role that race plays in the criminal proceedings. This, in sum, negatively affects this Court's legitimacy and the impartiality of its verdicts.

### D. The Systematic Exclusion of Black Residents from the Qualified Jury Pool Inflicts Grave Injuries on the Excluded Potential Jurors.

Finally, the systematic exclusion of Black residents from qualified jury pools adversely impacts the would-be jurors who are never provided the opportunity to sit on a jury. This Court's current Jury Selection Plan prevents potential Black jurors from participating in a fundamental aspect of American civil life. "Other than voting, serving on a jury is the most substantial opportunity that most citizens have to participate in the democratic process." *Flowers v. Mississippi*, 139 S. Ct. 2228, 2238 (2019). This Court should do everything within its power to ensure that Black potential jurors residing in our nation's capital are fairly represented in its qualified jury pools.

### III. This Court's Jury Selection Plan Substantially Fails to Comply with the JSSA and Violates Mr. Avery's Sixth Amendment Right to Be Tried by a Jury Comprised of a Fair Cross-Section of His Community.

This Court's Jury Selection Plan violates Mr. Avery's rights under the JSSA and the Sixth Amendment. Mr. Avery has established a prima facie fair-cross section under the three prongs of *Duren v. Missouri*. 439 U.S. 357, 364 (1979).

The first *Duren* prong is easily met as Black residents in the District of Columbia are undeniably a "distinctive group in the community." *See e.g.*, *Howell v. Superintendent Rockview SCI*, 939 F.3d 260, 265 (3d Cir. 2019) (internal quotation marks omitted).

Regarding the second *Duren* prong, the large and significant racial disparity in this Court's qualified jury pools demonstrates that Black people's representation in this Court's qualified jury pools "is not fair and reasonable in relation to the number of such persons in the community." 439 U.S. at 364. As a general rule, courts have found absolute disparities exceeding ten percent to be large enough to satisfy the second *Duren* prong. *See United States v. Shinault*, 147 F.3d 1266, 1273 (10th Cir. 1998); Paula Hannaford-Agor, *Systematic Negligence in Jury Operations: Why the Definition of Systematic Exclusion in Fair Cross Section Claims Must Be Expanded*, 59 Drake L. Rev. 761, 767–68 (2011). This Court's jury pools consistently surpass the ten percent absolute disparity mark: Black residents have been underrepresented in qualified jury pools by double digits in all but four of the last 65 two-week periods. Martin Decl. ¶ 56. So far in 2022, the absolute disparity for Black residents has been 16.38 percent underrepresentation. *Id.* ¶ 42. In 2021, the absolute disparity was 15.85 percent. *Id.* ¶ 41.

The comparative disparity, which shows the rate at which the Jury Selection Plan excludes Black people, confirms that the second *Duren* prong is satisfied. The comparative disparity in this Court's qualified jury wheel is 30.47 percent, meaning that this Court is "missing nearly a third of Black or African-American persons expected from the jury eligible population." Martin Decl. ¶ 45. With disparities as stark as those in this Court's qualified jury pools, there is no question that Black people's representation "is not fair and reasonable." *Duren*, 439 U.S. at 364.

Finally, under the third *Duren* prong, Mr. Avery has shown that the underrepresentation of Black residents in this Court's Jury Selection Plan is "due to systematic exclusion of [Black

residents] in the jury-selection process." *Id.* at 364. Courts have interpreted *Duren* to find that "'systematic exclusion' can be shown by a large discrepancy repeated over time such that the system must be said to bring about the underrepresentation." *United States v. Weaver*, 267 F.3d 231, 244 (3d Cir. 2001). The disparities that Mr. Avery has shown in the last four years of this Court's jury pools prove that exclusion of Black residents is "inherent in the particular jury-selection process utilized" and thus the exclusion of Black residents is "systematic" under *Duren*. 439 U.S. at 366. The underrepresentation is not happening by chance. *See* Martin Decl. ¶ 51 ("[T]he under-representation of Black or African-American persons on the Qualified Jury Wheel is not the result of random factors, chance, or luck, but is the result of a systematic process that under-represents Black or African-American persons."). The significant underrepresentation here shows that this Court's Plan is systematically excluding Black people. *See United States v. Rogers*, 73 F.3d 774, 777 (8th Cir. 1996) ("The extremely low probability that the underrepresentation would have occurred by chance alone provides further evidence that the system itself contributed to the lack of African-American participation in venire pools.").

This Court's Jury Selection Plan systematically excludes Black residents by utilizing source lists that are known to underrepresent Black people. It then exacerbates the overrepresentation of white people caused by the source lists by failing to deduplicate properly. And finally, this Court further compounds these problems by employing a summons procedure that disproportionately does not reach Black residents.

Under the Jury Selection Plan, the master jury wheel is comprised of the following three source lists from which the court draws potential jurors: 1) the D.C. Board of Elections voter list; 2) the D.C. Department of Motor Vehicles list of holders of licenses, permits, and ID cards; and 3) the D.C. Department of Finance and Revenue list of income-tax filers. Jury Selection Plan §

4.1. These types of source lists generally underrepresent Black people. *See* Equal Just. Initiative, *supra*, at 3.

The Jury Selection Plan then exacerbates the problem of missing Black potential jurors by failing to deduplicate properly. Duplicates comprise about one-tenth of the current list. Martin Decl. ¶ 64. Because the source lists this Court uses overrepresent white potential jurors and underrepresent Black potential jurors, failing to remove duplicative names magnifies the racial disparity in the jury pool. *See* Nat'l Ctr. for State Cts., *Jury Managers' Toolbox: Characteristics of an Effective Master Jury List* 2 (2009), https://www.jurytoolbox.org/more/Characteristics%20of%20Effective%20MJL.pdf. As described in more detail below, Black people tend to be underrepresented in the source lists used by this Court to populate its master jury wheel. Errors in the process of removing duplicates generate racial disparities. For instance, if the deduplication process fails to remove many true duplicate entries, individuals who are included in more of the source lists may have relatively more duplicate entries in the master list, which would increase the probability that those people are randomly selected to be included in the master jury wheel. *See id.* at 2.

Finally, the summons process exacerbates the racial disparities in the jury pool. This Court in *Smith* acknowledged that summons response rates "have been especially low among Black citizens." *See United States v. Smith*, No. 19-CR-324, 2022 WL 425059, at *26 (D.D.C. Feb. 11, 2022). There are known methods that other courts utilize to ensure that their summons reach a cross-section of the population. *See infra* Section IV.

This Court's current Jury Selection Plan is not sufficient to ensure that defendants like Mr. Avery have their Sixth Amendment right to face a jury comprised of a fair cross-section of their community under *Duren*. This Court has recognized its jury pools are unrepresentative, *see* Smith,

2022 WL 425059, at *21, but has not modified its Jury Selection Plan to stop systematically excluding Black residents.

Notwithstanding its recognition of the unrepresentative jury pools in *Smith*, this Court denied Mr. Smith relief on his *Duren* claim. But this case is distinguishable from *Smith* because in that case, Mr. Smith himself asserted (incorrectly) that the Court's Jury Selection Plan "was carefully calibrated to produce a fair cross-section of the community." *Id.* at *9 (citation omitted). The only argument that Mr. Smith raised in his fair cross-section claim was that the COVID-19 pandemic skewed the jury pool because it disproportionately impacted the Black community. Mr. Avery does not concede that this Court's Jury Selection Plan "was carefully calibrated to produce a fair cross-section of the community." *Id.* (citation omitted). To the contrary, Mr. Avery has demonstrated that the Jury Selection Plan has significant problems with its source lists, its deduplication protocol, and its summoning process, problems that, in combination, systematically exclude Black residents to create a qualified jury wheel where one-third of Black residents that should be in the wheel are missing. *See* Martin Decl. ¶ 45. This Court must now confront the systematic exclusion of Black residents that it has known about and failed to address.

## IV. This Court Could Easily Stop the Systematic Exclusion of Black Residents in the Qualified Jury Pools.

This Court's Jury Selection Plan's design flaws have led to significant racial disparities in its qualified jury pools. The source lists this Court uses to populate its master jury wheel undercount Black D.C. residents. This Court's summons procedures are inadequate and disproportionately do not reach Black residents. Further, the source lists that this Court uses are replete with duplicates (*supra* Section III). The combination of these three flaws has led to qualified jury pools that are significantly less diverse than the District of Columbia's population. The Court has the power and responsibility to fix the design flaws in its Jury Selection Plan.

14

**A. This Court Should Use Additional Source Lists to Ensure Better Diversity in the Qualified Jury Pools.**

The data sets relied on by this Court to populate its master jury wheel disproportionately exclude Black residents. This leads to this Court's unrepresentative qualified jury pools—the only pool from which actual jury venires are drawn. The JSSA requires that courts supplement their source lists when necessary to form representative jury venires. *See* 28 U.S.C. § 1863(b)(2). To achieve this statutory requirement, this Court should follow practices from other courts which supplement their list to increase the representativeness of their jury pools.

First, this Court could quickly supplement the list of data sources with residents who are qualified to receive public assistance (including unemployment benefits). This supplementation would yield a more representative source list and minimize the stark underrepresentation of Black jurors because this data source would identify Black residents who would not otherwise be counted. For instance, the vast majority of Supplemental Nutrition Assistance Program ("SNAP") benefits recipients in D.C. are Black: of the 45,779 households that received SNAP benefits in the District of Columbia in 2021, 38,543—or 84 percent—had a Black householder.[2] In addition to SNAP, Black Americans nationwide are nearly four times more likely than white Americans to receive TANF (Temporary Assistance for Needy Families), three times more likely to receive WIC (Special Supplemental Nutrition Program for Women, Infants, and Children), and more than twice

---

[2] *Table B22005B | Receipt of Food Stamps/SNAP in the Past 12 Months by Race of Householder (Black or African American Alone)*, U.S. Census Bureau: Am. Cmty. Survey, https://data.census.gov/table?q=B22&g=0400000US11&tid=ACSDT1Y2021.B22005B (last visited Nov. 21, 2022); *B22003 | Receipt of Food Stamps/SNAP in the Past 12 Months by Poverty Status in the Past 12 Months for Households*, U.S. Census Bureau: Am. Cmty. Survey, https://data.census.gov/cedsci/table?q=B22&g=0400000US11&tid=ACSDT1Y2021.B22003 (last visited Nov. 21, 2022).

as likely to receive SSI (Supplemental Security Income).[3] Some of these Black residents would not appear on the data sources that this Court uses to populate the master jury wheel but would appear on the list of public assistance recipients. Further, their contact information is likely to be more current than voter records and records from the Department of Motor Vehicles because public benefits recipients are frequently required to provide updated contact information to their case managers.[4]

For guidance, this Court need look no further than across the street. In May of 2020, the Superior Court of the District of Columbia revised its jury plan by including "the most recent list of individuals who have qualified to receive any type of public assistance in the District of Columbia," and "the most recent list of persons who have become naturalized citizens in the District of Columbia since the previous master jury list was created." Jury Plan for the Superior Court of the District of Columbia (May 28, 2020), https://www.dccourts.gov/sites/default/files/Jury-Plan-2019-Effective-Feb-2020.pdf. The D.C. Superior Court pulls potential jurors from the same exact neighborhoods as this Court. But since the D.C. Superior Court now has a more expansive set of data that it relies on to populate its master jury wheel, the Superior Court has recently had more success in recruiting Black jurors. The fact

---

[3] In May of 2022, the U.S. Census Bureau unveiled a new interactive data tool that sheds light on the demographic and socioeconomic characteristics of the people and households that received a range of social safety net benefits from 2013 to 2019. *New Interactive Data Tool Shows Characteristics of Those Who Receive Assistance from Government Programs*, U.S. Census Bureau (May 24, 2022), https://www.census.gov/library/stories/2022/05/who-is-receiving-social-safety-net-benefits.html.

[4] For example, according to DC's TANF requirements fact sheet, TANF recipients are required to keep in close contact with their caseworker and also submit a yearly renewal application where they must disclose updated contact information. *Important Information And Facts About TANF Requirements*, D.C. Dep't of Hum. Servs. https://dhs.dc.gov/sites/default/files/dc/sites/dhs/service_content/attachments/TANF%20Requirements%20Fact%20Sheet_1.pdf;https://dhs.dc.gov/sites/default/files/dc/sites/dhs/service_content/attachments/Cash%20Assistance%20Renewal%20Fact%20Sheet.pdf (last visited Nov. 21, 2022).

that both courts summon potential jurors from the exact same geographic area allows for an apples-to-apples point of comparison between the courts' respective jury plans and the resulting racial diversity of the jury pools.

From November 2021 through May 2022, 35.3 percent of the jurors who appeared in D.C. Superior Court for petit jury service were Black, an absolute disparity of 10.5 percent. Motion for Discovery of Petit Jury Selection Materials, *United States v. McClam*, No. 2019 CF1 9634 (D.C. Super. Ct. Aug. 18, 2022). On the other hand, only 29.39 percent of the jurors in this Court's qualified jury pool so far in 2022 have been Black, an absolute disparity of 16.38 percent. *See* Martin Decl. ¶ 25, 35, 42. That means this Court's absolute disparity is more than 50 percent larger than the Superior Court's, and it suggests that the Superior Court's decision to include public benefits recipients in its source list has played a part in its ability to garner a more racially representative jury pool.[5]

Additionally, it is important that this Court implement new processes designed to accurately remove duplicate records that usually occur from combining multiple source lists. There are several identified techniques that this Court could use to reduce the large amount of duplicates in the source lists that it uses to create its master jury wheel. *See* Nat'l Ctr. for State Cts., *Jury Managers' Toolbox: Best Practices for Duplicate Removal* 1–5 (2009), https://www.ncsc-jurystudies.org/__data/assets/pdf_file/0021/7851/duplicate-removal-techniques-report-mjl.pdf; *see* Martin Decl. ¶¶ 63–87.

---

[5] The DC Superior Court absolute disparity numbers provide a helpful comparison as the jury pools of both courts are comprised of the same population: residents of D.C. Further, the jury plans for both courts adopt the same methodology to calculate the jury eligible population for Black residents in D.C.: the number of Black citizens over the age of 18, based on the 2020 American Community Survey 5 Year Average data.

**B. This Court Should Periodically Update Address Information of Potential Jurors.**

The Court's inadequate procedure for maintaining addresses also generates a racial disparity in the District's pool of potential jurors. Black residents of D.C. are more likely to have lower socioeconomic statuses and higher residential mobility rates. Hannaford-Agor, *Systematic Negligence in Jury Operations*, *supra*, at 773 ("Local migration rates are highly correlated with socioeconomic status, which in turn is correlated with minority status. Individuals with lower socioeconomic statuses tend to change their place of residence more frequently . . . .") The District has a high residential mobility rate and people frequently move within D.C. Lisa A. Sturtevant, *Washington D.C. Region Is One of the More Transient Areas in the Country*, Wash. Post: Where We Live (Dec. 18, 2012), https://www.washingtonpost.com/blogs/where-welive/post/washington-dc-region-is-one-of-the-more-transient-areas-in-thecountry/2012/12/17/1ca26680-4883-11e2-820e-17eefac2f939_blog.html. If frequent changes of address by poorer residents, who are disproportionately Black, are not captured by the process for maintaining the master list, then it naturally follows that Black D.C. residents are less likely to receive their jury summons and will be less likely to appear on the master jury wheel. If the underrepresentation flows from systematic defects in the Court's Jury Selection Plan, then the government violated Mr. Avery's Sixth Amendment rights—whether it intended to discriminate or not.

Here, at a minimum, this court should update the addresses on the master jury wheel annually, using the National Change of Address (NCOA) list maintained by the United States Postal Service. More frequent reviews, of course, would be even better given the frequency with which people move in D.C. The American Bar Association's *Principles for Juries & Jury Trials*, endorsed by the Conference of Chief Justices, recommends that jurisdictions update their juror lists at least annually. Am. Bar Ass'n, Am. Jury Project, *Principles for Juries & Jury Trials,* 10

(2005). And the National Center for State Courts (NCSC) advises that "[c]ourts that are located in states or metropolitan areas with higher than average migration rates should consider creating or updating their master jury lists even more frequently (e.g., semi-annually or quarterly) if feasible." Nat'l Ctr. For State Cts., *Jury Managers' Toolbox: Best Practices to Decrease Undeliverable Rates*, 1 (2009), https://www.ncsc-jurystudies.org/__data/assets/pdf_file/0020/6806/undeliverable-best-practices.pdf. Such a change would be consistent with the current procedures followed by other jurisdictions. For example, the Massachusetts federal courts adopted a biannual review,[6] the Eastern District of Pennsylvania updates its jury list every six months,[7] and the Northern District of Illinois puts the master jury wheel addresses through the NCOA system every ninety days. Jeffrey Abramson, *Jury Selection in the Weeds*, 52 U. Mich. J. L. Reform 1, 42 (2018). The NCOA update would not be free of cost, but the cost should not be a barrier to change because, according to the NCSC, "[i]n almost every instance, the savings in printing and postage costs greatly exceed the cost of the NCOA update." Paula Hannaford-Agor, *Jury News: Neither Snow, Nor Rain, Not Heat, Nor Gloom of Night Stays These Couriers From the Swift Completion of Their Appointed Rounds*, 25 Ct. Manager 65, 66-67 (2010). This Court should regularly update its master jury list and addresses for jury summonses because it would improve jury yield and racial representation.

---

[6] See *Plan for Random Selection of Jurors*, U.S. Dist. Ct. for the Dist. of Mass (Nov. 1, 2015), http://www.mad.uscourts.gov/resources/pdf/RevisedJuryPlan.pdf ("The Clerk shall submit the names on the Master Jury Wheel and the Supplemental Jury Wheel twice a year to be updated through the national change-of-address system of the United States Postal Service and corrected as appropriate before issuing summonses.").

[7] Hon. Juan R. Sanchez, *A Plan of Our Own: The Eastern District of Pennsylvania's Initiative to Increase Jury Diversity*, 91 Temp. L. Rev. Online 1, 18 (2019).

**C. This Court Should, and Could Easily, Modify Its Juror Summoning Process to Increase the Fair Cross-Section of Its Jury Pools.**

This Court recently made the straightforward observation that summons response rates "have been especially low among Black citizens," but that an adequate response to this issue has not been implemented. *See Smith*, 2022 WL 425059, at *26. The Court could easily modify its juror summoning process, like other courts have, to increase the representation of Black residents in its qualified jury pools.

Even in the face of low response rates, this Court can comply with its affirmative duty to provide a representative jury pool by mailing a second notice to every person who does not respond to their first summons. The National Center for State Courts conducted a study comparing state jurisdictions that have a practice of mailing following-up notices to those that do not and concluded that in courts that follow-up, non-response and failure to appear rates were 24 percent to 46 percent less than those reported by courts that did not send follow-up mailings. Paula Hannaford-Agor, Nat'l Ctr. for State Cts., *An Overview of Contemporary Jury System Management* 7 (2011). At a minimum, this Court should implement a pilot program to study the effect of sending additional mailings on the non-response rate.

This Court could also send a substitute summons to another address in the same zip code or preemptively send a higher number of summonses to zip codes with high non-response rates. Many other jurisdictions follow one of these approaches to compensate for the disproportionately low yields of Black jurors. For instance, the federal District Court of Massachusetts allows oversampling of jury summonses, referred to as a zip-code-weighted mailing plan. The jury plan allows the clerk to make an initial random drawing from the master jury wheel. For every summons returned as "undeliverable" the clerk is then obligated to draw at random from the supplemental jury wheel of someone who lives in the same zip code as the undeliverable summons. Abramson,

*supra*, at 44. As the Chief Judge for the Eastern District of Pennsylvania, which also sends supplemental summons, explained:

> [W]hen a juror qualification questionnaire is not returned, another one is sent in its place. Specifically, the jury plan now provides that if a reasonable period of time has passed after the Clerk's Office has received a questionnaire as undeliverable, a second questionnaire is to be mailed, at random, to a different address in the same zip code. By resending questionnaires to individuals located in the same zip code, as opposed to the same county, the court hopes to maintain geographic proportionality and representation.

Sanchez, *supra* note 7, at 18. This Court should similarly engage in a targeted or weighted summonsing system to compensate for disproportionately low yields of Black jurors.

These problems should not be dismissed as the fault of Black residents for ignoring their summonses or not updating their addresses, and it would be a mistake to attribute these design errors to the "independent behavior of individual citizens." *Smith*, 2022 WL 425059, at *34. Instead, these problems fall squarely on the shoulders of the Court's Jury Selection Plan. The phenomenon of people living in poorer areas of the city not responding to a jury summons results from structural forces, including poverty, housing disparities, and systemic racism. *See, e.g.*, Sandra F. Sperino, *Rethinking Discrimination Law*, 110 Mich. L. Rev. 69, 92–93 (2011) ("It is likely that structural problems and unconscious bias contribute to the discriminatory environment."). The concrete suggestions laid out above have all proven capable of helping to obtain a more representative jury.

This Court should put an end to the structural design flaws that result in the systematic exclusion of Black D.C. residents in qualified jury pools. Supplementing its source list, periodically updating the contact information for potential jurors, and implementing common-sense changes to its juror summoning process would accomplish just that.

## CONCLUSION

For the foregoing reasons, this Court should grant Mr. Avery's motion to stay proceedings.

Should the Court grant LDF's motion, LDF also requests to participate in any hearing on Mr.

Avery's motion to stay proceedings.


Respectfully submitted November 23, 2022.

|  | /s/ Charles McLaurin |
|---|---|
| JANAI S. NELSON** | CHRISTOPHER E. KEMMITT** |
| *Director-Counsel* | CHARLES MCLAURIN (Bar No. 1000107) |
| SAMUEL SPITAL | MOLLY M. CAIN* |
| NAACP LEGAL DEFENSE & | NAACP LEGAL DEFENSE & |
| EDUCATIONAL FUND, INC. | EDUCATIONAL FUND, INC. |
| 40 Rector Street, 5th Floor | 700 14th Street N.W., Suite 600 |
| New York, NY 10006 | Washington, DC 20005 |
| Tel.: (212) 965-2200 | Tel.: (202) 682-1300 |
| Fax: (212) 226-7592 | Fax: (202) 682-1312 |
|  | cmclaurin@naacpldf.org |

*Pro hac vice admission pending*
** *Pro hac vice motion forthcoming*

22

## CERTIFICATE OF COMPLIANCE

This brief complies with the type-volume limitations of LCvR 7, as it does not exceed 25 pages.

This brief complies with the typeface requirements of LCvR 5.1(d), as this brief has been prepared using Microsoft Word in 12-point Times New Roman font.

*/s/ Charles McLaurin*
Charles McLaurin (D.C. Bar No. 1000107)
NAACP LEGAL DEFENSE &
EDUCATIONAL FUND, INC.
700 14th Street N.W., Suite 600
Washington, DC 20005
Tel.: (202) 682-1300
Fax: (202) 682-1312
cmclaurin@naacpldf.org

*Attorney of Record for* Amicus Curiae *LDF*

23

## CERTIFICATE OF SERVICE

I hereby certify that on November 23, 2022, I served an electronic copy of the foregoing

Brief of *Amicus Curiae* upon counsel of record for the parties in this matter, by sending an email

to the following individuals:

1. Brian Shiue
   Paul, Weiss, Rifkind, Wharton & Garrison LLP
   Email: bshiue@paulweiss.com

2. Clayton Wild
   Paul, Weiss, Rifkind, Wharton & Garrison LLP
   Email: cwild@paulweiss.com

3. Mark Mendelsohn
   Paul, Weiss, Rifkind, Wharton & Garrison LLP
   Email: mmendelsohn@paulweiss.com

4. Eugene Jeen‑Young Kim Ohm
   Federal Public Defender for the District of Columbia
   Email: eugene_ohm@fd.org

5. James Nelson
   U.S. Attorney's Office for the District of Columbia
   Email: james.nelson@usdoj.gov

6. Meredith Erin Mayer-Dempsey
   U.S. Attorney's Office for the District of Columbia
   Email: meredith.mayer‑dempsey@usdoj.gov

Respectfully submitted,

*/s/ Charles McLaurin*

Charles McLaurin (D.C. Bar No. 1000107)
NAACP LEGAL DEFENSE &
EDUCATIONAL FUND, INC.
700 14th Street N.W., Suite 600
Washington, DC 20005
Tel.: (202) 682-1300
Fax: (202) 682-1312
cmclaurin@naacpldf.org

*Attorney of Record for* Amicus Curiae *LDF*